

# NUMBER 13-17-00590-CV

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

**CHRISTUS SPOHN HEALTH
SYSTEM CORPORATION D/B/A
CHRISTUS SPOHN HOSPITAL
CORPUS CHRISTI-SHORELINE,** Appellant,

**v.**

**ELDA ALANIZ,** Appellee.

## On appeal from the County Court at Law No. 1
of Nueces County, Texas.

## MEMORANDUM OPINION

**Before Justices Contreras, Longoria, and Hinojosa
Memorandum Opinion by Justice Hinojosa**

This is an interlocutory appeal of the trial court's order denying appellant Christus

Spohn Health System Corporation d/b/a Christus Spohn Hospital Corpus Christi -

Shoreline's (Christus Spohn) motion to dismiss the healthcare liability claims of appellee

Elda Alaniz. *See* TEX. CIV. PRAC. & REM. CODE ANN. §§ 51.014(a)(9), 74.351(a), (b) (West, Westlaw through 2017 1st C.S.). In one issue, which we construe as two, Christus Spohn contends that the trial court abused its discretion in overruling its objections to the reports of Drs. Nancy Futrell and Lige B. Rushing and denying dismissal on the grounds that the reports: (1) fail to establish that either doctor is qualified to testify regarding the standard of care applicable to appellant, a hospital; and (2) convey only impermissibly conclusory and speculative opinions regarding the (a) standard of care, (b) breach, and (c) causation. We reverse and remand.

## I. BACKGROUND

According to Alaniz's original petition, on July 14, 2015, Alaniz, who was then fifty-nine years old, "began having new onset hypertension, malaise, fevers, night sweats, Raynaud's phenomenon and positive ANA, resulting in her" admission to Christus Spohn through the emergency department. On July 15, 2015, at 2:00 p.m., an angiogram of Alaniz's upper extremities was performed on orders from Dr. Adriana Pop-Moody, a rheumatologist. At 4:15 p.m., Alaniz developed nausea, left facial droop, an inability to move her left arm, and weakness in her left leg. In Futrell's report, she opined that an "[a]ngiography is a well-recognized cause of stroke . . . ." At that point, a "stroke code was called" and a CT of Alaniz's brain was ordered to determine any "tPA contraindications."[1] After some delay, Dr. Eric Sklar, a telestroke consultant, recommended treatment with tPA at 8:10 p.m. notwithstanding a concern that the tPA be

---

[1] According to Futrell's report, tPA is short for "tissue plasminogen activator," and it is an agent that breaks down clots.

2

administered within the therapeutic window of four and a half hours after the onset of a stroke. The final decision to administer the tPA was made at 8:30 p.m. However, the tPA was not administered by 8:45 p.m., the end of the therapeutic window. Therefore, the order for tPA was cancelled.

In Alaniz's original petition, she alleges that Christus Spohn was negligent in "[f]ailing to timely mix and administer the tPA to Ms. Alaniz in the PACU [post-anesthesia care unit] within ten minutes of the order for the tPA given by Dr. Sklar."

Alaniz attached a report by Futrell to her original petition. Christus Spohn objected to Futrell's qualifications and to her report on the grounds that Futrell's opinions regarding standard of care, breach, and causation were conclusory and speculative. The trial court overruled Christus Spohn's objections to Futrell's report. Alaniz later served Christus Spohn with a report by Rushing. As with Futrell's report, Christus Spohn objected to Rushing's qualifications and to his report on the grounds that Rushing's opinions regarding standard of care, breach, and causation were conclusory and speculative. Christus Spohn later moved to dismiss Alaniz's healthcare liability claims under chapter 74. The trial court denied Christus Spohn's objections to Rushing's report and its motion to dismiss. This interlocutory appeal followed.

## II. DISCUSSION

Christus Spohn's objections to the qualifications of Futrell and Rushing and to their opinions regarding all three statutory elements—standard of care, breach, and causation—are nearly identical. However, their reports differ in detail. We will address Christus Spohn's objections by expert, beginning with its qualification challenge and

3

proceeding to each of the statutory elements.

## A.    General Authority & Standard of Review

An "expert report" is a written report by an expert that provides a fair summary of the expert's opinions as of the date of the report regarding applicable standards of care, the manner in which the care rendered by the physician or health care provider failed to meet the standards, and the causal relationship between that failure and the injury, harm, or damages claimed. *Id.* § 74.351(r)(6).

When a report and CV are timely served on a defendant, any objections to the sufficiency of the report and any objections to the expert's qualifications must be raised by the defendant within twenty-one days after service of the report and CV. *See id.* § 74.351(a) (providing a twenty-one-day deadline for a defendant health care provider whose conduct is implicated in a report to file and serve any objection to the sufficiency of the report); *see also id.* § 74.402(f) (West, Westlaw through 2017 1st C.S.) (providing a twenty-one-day deadline for a defendant health care provider to object to the qualifications of a witness).

A trial court's ruling on the sufficiency of an expert's report is reviewed for an abuse of discretion. *Van Ness v. ETMC First Physicians*, 461 S.W.3d 140, 142 (Tex. 2015). Under this review, we defer to the trial court's factual determinations if they are supported by the evidence, but review its legal determinations de novo. *Id.* A trial court abuses its discretion if it acts without reference to guiding rules or principles. *Id.* However, in exercising its discretion, it is incumbent upon the trial court to review the reports, sort out their content, resolve any inconsistencies, and decide whether the reports demonstrate a

4

good faith effort to show that the plaintiff's claims have merit. *See id.* at 144; *see* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(l) ("A court shall grant a motion challenging the adequacy of an expert report only if it appears to the court, after hearing, that the report does not represent an objective good faith effort to comply with the definition of an expert report . . . .").

**B.    Qualifications**

To opine on the standard of care applicable to a non-physician healthcare provider an expert must meet the qualifications of section 74.402. TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(r)(5)(B). Subsections 74.402(b) and (c) provide the following qualifications for an expert:

> (b)    In a suit involving a health care liability claim against a health care provider, a person may qualify as an expert witness on the issue of whether the health care provider departed from accepted standards of care only if the person:
>
> > (1)    is practicing health care in a field of practice that involves the same type of care or treatment as that delivered by the defendant health care provider, *if the defendant health care provider is an individual*, at the time the testimony is given or was practicing that type of health care at the time the claim arose;
> >
> > (2)    has knowledge of accepted standards of care for health care providers for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim; and
> >
> > (3)    is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care.
>
> (c)    In determining whether a witness is qualified on the basis of training or experience, the court shall consider whether, at the time the claim arose or at the time the testimony is given, the witness:

5

>       (1)     is certified by a licensing agency of one or more states of the United States or a national professional certifying agency, or has other substantial training or experience, in the area of health care relevant to the claim; and
>
>       (2)     is actively practicing health care in rendering health care services relevant to the claim.

*Id.* § 74.402(b), (c) (emphasis added). Christus Spohn is not an individual. Therefore, subsection 74.402(b)(1) does not apply. *See id.* § 74.402(b)(1); *see also Doctors Hosp. v. Hernandez*, No. 01-10-00270-CV, 2010 WL 4121678, at *4–5 (Tex. App.—Houston [1st Dist.] Oct. 21, 2010, no pet.) (mem. op.) (applying subsection 74.402(b)(1)).

### 1.     Futrell

Futrell is board certified in neurology, and she founded the Intermountain Stroke Center. The Intermountain Stroke Center developed the first urgent care "TIA clinic" in the United States. According to Futrell's report, the TIA clinic "is now recognized as the best system of care for patients with TIA or minor strokes, keeping them out of the hospital at a major cost savings without sacrificing any quality of outcome." Futrell has served on the editorial board of the following journals: *Stroke*, *Surgical Neurology*, *Journal of Stroke and Cerebrovascular Disease*, *Cerebrovascular Disease*, and *Stroke & Vascular Neurology*.

In the trial court, Christus Spohn objected to Futrell's qualifications on the following grounds:

> In her report, Dr. Futrell provides three paragraphs regarding her alleged "qualifications to testify in this area." [] In describing her qualifications, Futrell makes absolutely no mention of any specific familiarity she may have with hospital and nursing staff mixing and/or administering tPA. Further,

6

she fails to reference any experience she has in working with hospital and nursing staff regarding their mixing and/or administering tPA. Nowhere in her report does Dr. Futrell describe the basis for her knowledge regarding the hospital and nursing staffs mixing and/or administering tPA. She fails to describe any training or experience she may have regarding the hospital and nursing staff's role(s) in mixing and/or administering tPA. A review of Dr. Futrell's report and curriculum vitae do not reveal that she has ever worked as a hospital staff employee or nurse in mixing and/or administering tPA or that she has ever trained or educated hospital employees or nurses specifically on mixing and/or administering tPA.

Christus Spohn's objections aptly note that Futrell is neither a nurse nor a hospital employee. However, subsection 74.402(b)(1) does not require that Futrell be "practicing health care in a field of practice that involves the same type of care or treatment as that delivered by" Christus Spohn because it is not an individual. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(1); *see also Hernandez*, 2010 WL 4121678, at \*4–5 (applying subsection 74.402(b)(1)). Similarly, subsections 74.402(b) and (c) do not require Futrell to have personally mixed and administered tPA to qualify under the health care liability statute.

Instead, the first applicable statutory requirement is that Futrell have knowledge of accepted standards of care for health care providers such as Christus Spohn for the diagnosis, care, or treatment of the illness, injury, or condition involved in the claim, which as pleaded in this case is the timely mixing and administration of tPA by hospital personnel. *Id.* § 74.402(b)(2). The next applicable statutory requirement is that Futrell "is qualified on the basis of training or experience to offer an expert opinion regarding those accepted standards of health care." *See id.* § 74.402(b)(3). In assessing a physician's "training or experience" a court must look to whether the expert is certified by

7

a licensing agency and is actively practicing health care in rendering health care services relevant to the claim. *Id.* § 74.402(b)(3), (c).

In the section of her report titled "Causation," Futrell explains that she has "clinical experience in giving tPA to 12 patients under the age of 60, all of whom returned to their previous activities with little or no neurologic deficit." This statement demonstrates experience "in giving tPA" and patients' outcomes after it is "given." However, health care services relevant to the pleaded claim involves the mixing and administration of tPA by hospital personnel. *Cf. Tenet Hosps. Ltd. v. Barnes*, 329 S.W.3d 537, 546–47 (Tex. App.—El Paso 2010, no pet.) (holding expert qualified to state standard of care for hospital where report stated expert had experience with type of claim at issue, including being "involved in care of about 250 patients" similar to patient at issue and curriculum vitae showed he was "Chief of Surgery"); *Rusk State Hosp. v. Black*, 379 S.W.3d 283, 292 (Tex. App.—Tyler 2010), *rev'd on other grounds by* 392 S.W.3d 88 (Tex. 2012) (holding psychologist qualified to opine concerning mental hospital's standard of care based in part on psychologist's "extensive training and experience in the diagnosis and treatment of mental disorders" and service "as supervising or consulting psychologist at numerous mental health facilities").

Given Futrell's failure to demonstrate knowledge of accepted standards of care for hospital personnel in the mixing and administrating tPA and that she is actively practicing health care in rendering health care services relevant to the claim, the trial court abused its discretion by concluding otherwise. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(2), (b)(3), (c)(2); *cf. Barnes*, 329 S.W.3d 546–47; *Black*, 379 S.W.3d at 292.

8

## 2. Rushing

Rushing is board-certified in internal medicine, rheumatology, and geriatrics, and he is on the attending staff of Presbyterian Hospital of Dallas. In describing his qualifications, Rushing writes:

> In the regular course of my practice, I have occasions to diagnose and treat patients with conditions substantially similar or identical with Elda Alaniz. Over the course of my career, I have been primary care physician for more than 10,000 patients in hospitals and nursing homes. . . I have conferred with radiologist and PCPs in the administration of TPA and [sic] hospital settings on a number of occasions. I am familiar with the treatment of patients like Mrs. Alaniz by all of the classes of individuals including hospital personnel.

In the trial court, Christus Spohn objected to Rushing's qualifications on the following grounds:

> While Dr. Rushing claims he is familiar with the treatment of patients like Mrs. Alaniz by all classes of individuals including hospital personnel, he does [sic] specifically discuss or describe any familiarity he may have with how hospital personnel prepare, mix and administer tPA. Further, he fails to reference any experience he has in working with hospital personnel regarding preparing, mixing and administering tPA. Nowhere in his report does Dr. Rushing describe the basis for his knowledge regarding the hospital personnel's role or responsibility in preparing, mixing and administering tPA. He fails to describe any training or experience he may have regarding the hospital personnel's role(s) in preparing, mixing and administering tPA. A review of Dr. Rushing's report and curriculum vitae do not reveal that he has ever worked as "hospital personnel" or actually himself prepared, mixed and administered tPA or that he has ever trained or educated hospital personnel specifically on how to perform these tasks.

Rushing's description of his qualifications in this case is remarkably similar to the qualifications he described in *Nexion Health at Garland, Inc. v. Treybig*, No. 05-14-00498-CV, 2014 WL 7499373, at *5 (Tex. App.—Dallas Dec. 31, 2014, no pet.) (mem. op.), in which he wrote:

9

> In the regular course of my medical practice I have occasion to diagnose and treat patients with conditions similar to or identical with Mr. Treybig. [D]uring the course of my career I have provided primary medical care to more than 10,000 patients in hospitals, nursing homes and assisted living facilities. I have provided care to patients who, like Mr. Treybig, were suffering from diabetes, hip replacement therapy, complications from infections, amputations, and spinal injuries. I have written orders for the care and treatment of these patients and have supervised the execution of these orders by RNs LVN's and CAN's who were assigned to provide the hands-on care to my patients. These orders included orders for the treatment for hip pain as well as the treatment of spinal injuries. I am therefore intimately familiar with the standards of care for the facilities involved in this claim as well as the RNs, LVN's and CAN's who provid[ed] care to Mr. Treybig.

*Id.* In *Treybig*, a nursing home patient allegedly sustained a vertebral compression fracture during physical therapy. *Id.* at \*1. The patient alleged that the nursing home "engaged, contracted with, and/or hired" the physical therapist's employer and that the nursing home and the physical therapist's employer failed to "design and/or implement" adequate care plans. *Id.* The court of appeals held that Rushing's report did not adequately articulate how he was qualified to opine on the standard of care applicable to a nursing home when it contracts with another health care provider to provide a resident with physical therapy care or treatment. *Id.* at \*6.

Although not directly on point and not binding, the analysis of Rushing's qualifications in *Treybig* is instructive. In his report, Rushing fails to explain in a non-conclusory fashion how he has the knowledge of accepted standards of care. That Rushing has had "occasions to diagnose and treat patients substantially similar to or identical with" Alaniz does not explain whether Rushing has any experience with hospital personnel tasked with mixing and administering tPA. Rushing's "conferr[ing] with

radiologist and PCPs in the administration of TPA and [sic] hospital setting on a number of occasions" leaves one wondering whether Rushing was the physician who ordered the administration of tPA or was merely informed by a "radiologist and PCP" that tPA was administered. This gap implicates subsections 74.402(b)(3) and (c)(2) in that Rushing does not indicate in a non-conclusory fashion that he is actively practicing health care in rendering health care services relevant to the claim. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.402(b)(3), (c)(2).

Given Rushing's failure to demonstrate (1) knowledge of accepted standards of care for hospital personnel in the mixing and administrating tPA or (2) that he is actively practicing health care in rendering health care services to patients in need of tPA, the trial court abused its discretion by concluding that he possessed knowledge of accepted standards of care for hospitals such as Christus Spohn in mixing and administering tPA. *See id.* § 74.402(b)(2)–(3), (c); *see also Treybig*, 2014 WL 7499373, at *5–6.

### 3. Relation to Other Objections

Christus Spohn complains that Futrell's and Rushing's opinions regarding the standard of care, breach, and causation elements are speculative because both experts are unqualified. We need not address Christus **Spohn's challenge to the statutory elements on speculative grounds** at this time because we will remand for the trial court to consider whether to grant Alaniz a thirty-day extension to submit supplemental or amended reports. *See* TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(c); TEX. R. APP. P. 47.1; *see also Scoresby v. Santillan*, 345 S.W.3d 546, 549 (Tex. 2011) ("An individual's lack of relevant qualifications and an opinion's inadequacies are deficiencies the plaintiff

11

should be given an opportunity to cure if it is possible to do so.").

### 4. Holding

Christus Spohn's first issue is sustained.

## C. Expert Report Elements

In what we construe as Christus Spohn's second issue, it contends that the trial court abused its discretion in denying its motion to dismiss on the ground that the reports of Futrell and Rushing convey only impermissibly conclusory and speculative opinions regarding the (1) standard of care, (2) breach, and (3) causation.

### 1. Standard of Care

#### a. Futrell

In a section of her report titled "Failure to give TPA", Futrell writes:

> The appropriate treatment for an acute stroke is thrombolysis with tPA (tissue plasminogen activator). This agent breaks down clot, particularly fresh clot such as those produced by angiography, and can dissolve the clot and reverse all or part of the symptoms of a stroke. The earlier tPA is given, the higher the likelihood for complete recovery. The standard of care requires that a recognized in hospital stroke, such as that suffered by Ms. Alaniz, be treated with IV tPA within 60 (up to 90) minutes of onset of the stroke. The benefit of tPA decreases by 3% with every 15 minutes of treatment delay, and after 4 ½ hours it is not recommended, as the bleeding risk becomes high and the likelihood of benefit diminishes significantly.

> Administration of tPA in a timely fashion requires recognition of the stroke (which was done, and a stroke alert was properly called), performance of a STAT CT scan (which was appropriately done in a timely fashion) and immediate consultation with a physician skilled in administration of tPA, in this case the telestroke physician, Sklar (which was not done within the appropriate time frame). Unfortunately, the treating physicians and nurses breached the standard of care in multiple points in the evaluation and preparation of the treatment of this stroke, resulting in the failure to given [sic] the tPA within 4.5 hours. Breaches of the standard of care include:

. . . .

[]      Failure of the hospital staff to mix and/or administer the tPA to Ms. Alaniz in the PACU within 10 minutes of the order for tPA given by Sklar at 20:30.

[]      Putting the transfer of the patient out of the PACU as a more important priority than the urgent treatment tPA to reverse the stroke. The tPA bolus should have been given, the tPA infusion started, in whatever room the patient was located.  It is not clear whether the pharmacy failed to make the tPA available, whether the nurses failed to mix and administer the tPA or whether hospital transport personnel began the transfer before medication orders were followed.

A timeline of events in relation to the therapeutic window gleaned from the reports of

Futrell and Rushing provides:

| Time | Remaining Therapeutic Window | Description |
| --- | --- | --- |
| 4:00 p.m. | | Angiogram performed |
| 4:15 p.m. | 4.5 hours | Therapeutic window begins as inferred from Futrell's report; onset of symptoms per telestroke physician Sklar's notes and "stroke code" called |
| 6:15 p.m. | 2.5 hours | Onset of stroke symptoms, including nausea, left facial droop, inability to move the left arm, and weakness of the left leg per Futrell's report |
| 6:36 p.m. | 2 hours 9 minutes | CT of the brain performed |
| 7:25 p.m. | 1 hour 20 minutes | Sklar received initial, "non-emergent" page |
| 8:10 p.m. | 35 minutes | Sklar recommends tPA |
| 8:30 p.m. | 15 minutes | tPA orders given |
| 8:43 p.m. | 2 minutes | Sklar informed by Pop-Moody that tPA had not yet been given and that it was not even mixed |
| 8:45 p.m. | 0 minutes | End of therapeutic window |
| 8:50 p.m. | + 5 minutes | tPA still not mixed and Sklar orders tPA cancelled |

Futrell's standard of care opinions are, according to objections Christus Sphon

13

lodged in the trial court, conclusory because "she does not describe or explain the required process for the hospital staff or nurse to follow regarding mixing and/or administering tPA in order to meet the standard of care beyond stating the stroke be 'treated with IV tPA within 60 (up to 90) minutes of onset . . . and after 4 ½ hours is not recommended.'"

"A good-faith effort must 'provide enough information to fulfill two purposes: (1) it must inform the defendant of the specific conduct the plaintiff has called into question, and (2) it must provide a basis for the trial court to conclude that the claims have merit.'" *Miller v. JSC Lake Highlands Operations, LP*, 536 S.W.3d 510, 513 (Tex. 2017) (quoting *Bowie Mem'l Hosp. v. Wright*, 79 S.W.3d 48, 52 (Tex. 2002) (per curiam)). All information needed for this inquiry is found within the four corners of the expert report, which need not marshal all of the plaintiff's proof. *Jelinek v. Casas*, 328 S.W.3d 526, 539 (Tex. 2010)

Futrell's standard of care opinions are not conclusory when read with the entirety of her report. Futrell opines that the breaches of the standard of care included, among other things, "[f]ailure of the hospital staff to mix and/or administer the tPA to Mrs. Alainz in the PACU within 10 minutes of the order for tPA given by Dr. Sklar at 20:30." Thus, Futrell gave a timeframe, as sketched out above, during which the tPA should have been mixed "and/or" administered. This ten-minute timeframe would have been before 8:45 p.m., the expiration of the four-and-a-half-hour therapeutic window.

Christus Spohn's insistence that Futrell "describe or explain the required process for the hospital staff or nurse to follow regarding mixing and/or administering tPA" coupled

14

with its appellate complaints[2] evidences a belief on its part that the tPA could not be mixed and administered within the timeframe described by Futrell. Such insinuations violate the four corners rule articled by the Texas Supreme Court that "the only information relevant to the inquiry is within the four corners of the" the expert report. *Am. Transitional Care Ctrs. of Tex., Inc. v. Palacios*, 46 S.W.3d 873, 878 (Tex. 2001). In other words, at this juncture, Christus Spohn may not prevail by attacking—directly or indirectly—Futrell's report with opinions not contained within the four corners of her report. Christus Spohn may disagree with Futrell's standard of care opinions, but her standard of care opinions are sufficiently stated to provide it with notice of the conduct at issue. *See Estorque v. Schafer*, 302 S.W.3d 19, 30 (Tex. App.—Fort Worth 2009, no pet.).

### b. Rushing

Rushing writes, "The standard of care for a hospital in this situation is to timely prepare and mix the TPA." Christus Spohn's objections in the trial court assert that Rushing's opinion is conclusory. We agree. Unlike Futrell's opinion, we cannot see where Rushing's timely preparation opinion fits within the timeline.

As with Futrell, Christus Spohn objects that Rushing "fails to describe or explain the required process for hospital personnel to follow regarding preparing and mixing the

---

[2] On appeal, Christus Spohn complains that:

Futrell provides no information about which members of the "hospital staff" are involved in mixing and administering tPA (e.g., nurses, pharmacists, or others). Futrell provides no discussion of what those staff members should have done or what care was expected from them. Was the staff supposed to call the pharmacy? Go to the pharmacy to get the medicine? Who mixes tPA? Who administers tPA? How long does the process ordinarily take? Can the order be implemented within ten minutes?

15

tPA in order to meet the standard of care," and it lodges similar appellate complaints.[3]

Our discussion regarding the four corners rule in *Palacios* applies to Christus Spohn's complaints regarding Rushing's report just as it did to its complaints regarding Futrell's report. While Rushing's opinion regarding the standard of care is conclusory, at this juncture, Christus Spohn may not prevail by attacking—directly or indirectly—Rushing's report with opinions not contained within the four corners of her report. *See Palacios*, 46 S.W.3d at 878.

### 2.   Breach

#### a.   Futrell

As noted above, Christus Spohn complains that Futrell's breach opinion is speculative because she is unqualified. As part of Christus Spohn's complaint, it asserts that "Futrell even admits to her speculation when she states, 'It is not clear whether the pharmacy failed to make the tPA available, whether the nurses failed to mix and administer he tPA of whether the hospital transport personnel began the transfer before

---

[3] On appeal, Christus Spohn complains that:

From this conclusory statement, the Hospital could not determine whether Rushing believed the hospital personnel should have called the pharmacy "stat"? Should the hospital personnel have gone to the pharmacy? Who prepares or mixes tPA? Can the task be performed within ten minutes? If the mixing process should have been started sooner (which Rushing states, without stating who should have started sooner), how much sooner, and can nurses or pharmacists or other Hospital personnel take such action without a doctor's order, considering that nurses cannot order treatments under their scope of practice? What if the tPA had been sitting around mixed for two hours? Does mixed tPA retain its effectiveness after a certain amount of time? These multiple unanswered questions establish that Rushing's five-word standard of care is conclusory and deficient.

(footnote and record citation omitted).

16

medication order were followed." Earlier in Futrell's report, she writes:

> It should be noted that the records from Christus Spohn Hospital are some of the most difficult medical records I have ever seen. There are multiple repetitive flow sheets, which list all of the problems that a nurse should consider on each evaluation of any patient—male or female—adult or child, including the definitions of these problems. Interesting there were lists of about 6 problems of the male reproductive system repeated multiple times in the chart of this female patient. In the flow sheets the vast majority of the information printed on the page had nothing to do with the patient. This makes it difficult to cull out the information that was entered to document the status of this patient and the care she received. Sometimes I had difficulty determining whether sentences belonged to this patient's care or not!! [sic] I reviewed the case carefully, but I need to reserve the right to alter my description of the course of events (including clinical evaluation and times) due to ambiguities inherent in the medical record.

In reviewing the entirety of Futrell's report and sorting out its content, *see Van Ness*, 461 S.W.3 at 142, the trial court may have deemed Futrell's statement related to the state of its medical records regarding Alaniz's care rather than as supporting its speculation contention.

Christus Spohn's final objection regarding Futrell's breach opinion is that it is conclusory "because Futrell does not discuss the alleged breach beyond stating it occurred by '[f]ailure of the hospital staff to mix and/or administer the tPA to Ms. Alaniz in the PACU within 10 minutes of the order for tPA given by Sklar at 20:30.'" We disagree. Futrell's breach opinion provides a clear timeframe of ten minutes, and it identifies the class of individuals involved as hospital staff. Accordingly, it provides Christus Spohn with the specific conduct Alaniz has called into question and provides the trial court a basis for it to conclude that the claims have merit. *See Miller*, 536 S.W.3d at 513.

### b. Rushing

Christus Spohn objected to Rushing's breach opinion by arguing:

Rushing's breach opinion is conclusory because Dr. Rushing does not discuss the alleged breach beyond stating, "Christus Spohn Hospital failed to meet the standard by not timely mixing the TPA with in [sic] the 4 ½ hour therapeutic window" and "[t]he hospital staff, . . . violated standard of care when she was subjected to inordinate and improper delay in administering TPA."

Standing alone, Rushing's statement regarding "inordinate and improper delay in administering" tPA is conclusory. However, section 74.351(i) allows a healthcare liability claimant to use multiple expert reports to satisfy any of the statutory requirements. *See Miller*, 536 S.W.3d at 514 (citing Tex. Civ. Prac. & Rem. Code Ann. § 74.351(i)). As noted in the preceding subsection, Futrell's elaboration that the tPA should have been mixed and/or administered within ten minutes is not conclusory and it clarifies Rushing's opinion regarding "inordinate and improper delay."

### 3. Causation

#### a. Futrell

As for causation, Futrell's opines:

Had the standard of care not been breached by failing to give tPA within 2 hours of the stroke, the patient would have had a good recovery. Given the increased recovery potential of people under the age of 60, and given the fact that her treatment could have been early as her stroke occurred in the hospital and was promptly recognized, she would have recovered to little or no deficit. She would have been independent in all her activities of daily living and would likely have returned to all of her previous activities. Th[ese] opinions [are] based also on my clinical experience in giving tPA to 12 patients under the age of 60, all of whom returned to their previous activities with little or no neurologic deficit.

Christus Spohn raises two objections to these opinions.

First, Christus Spohn objects that Futrell's "causation opinion suggesting [Alaniz]

18

'would have had a good recovery' is speculative and a rank guess. Futrell claims [Alaniz] 'would have recovered to little or no deficit' and 'would have been independent' but offers no medical facts specific to this patient in support of her opinion." Christus Spohn fails to explain what "medical facts specific to" Alaniz it finds lacking. Futrell explains that Alaniz was diagnosed with a stroke in a hospital setting, which, if the standard of care had been followed, would theoretically allow for prompt treatment. Futrell also explains that at fifty-nine years old, Alaniz fell within a cohort that was capable of "increased recovery potential." These are two "medical facts specific to" Alaniz.

> Second, Christus Spohn objects that:
>
> Futrell's causation opinion is conclusory because she fails to explain how the nursing staff and hospital's failure to mix and/or administer the tPA to Ms. Alaniz in the PACU within 10 minutes of the order for it proximately caused Ms. Alaniz' injuries. She provides no explanation of how or why medically [Alaniz] would have had a good recovery. Further, Dr. Futrell fails to explain how the hospital and nursing staff's failure to mix and/or administer the tPA within 10 minutes of its order was a substantial factor in bringing about Ms. Alaniz' injuries and but for this specific alleged failure her injuries would not have occurred.

As noted above, Futrell opines that the breaches of the standard of care included, among other things, "[f]ailure of the hospital staff to mix and/or administer the tPA to Mrs. Alaniz in the PACU within 10 minutes of the order for tPA given by Sklar at 20:30." As we read Christus Spohn's objection, it expects Futrell to explain how precisely a ten-minute delay caused Alaniz's poor recovery of the stroke that she suffered. Christus Spohn's isolation of the phrase "10 minutes" is inapposite given the trial court's obligation to read the entire report. *See Van Ness v*, 461 S.W.3d at 144. The ten-minute delay pushed back the administration of tPA from 8:30 p.m. to at least 8:40 p.m., five minutes before the

19

expiration of the four-and-a-half-hour therapeutic window. As Futrell recounted Alaniz's medical history, she noted that the tPA had not been administered by 8:43 p.m., and the decision was made that the therapeutic window had closed. Earlier in Futrell's report, she opines that the "benefit of tPA decreases by 3% with every 15 minutes of treatment delay, and after 4 ½ hours it is not recommended, as the bleeding risk becomes high and the likelihood of benefit diminishes significantly." Futrell also opines that tPA "breaks down clot, particularly fresh clot such as those produced by angiography, and can dissolve the clot and reverse all or part of the symptoms of a stroke." To the extent Christus Spohn yearns for a quantifiable metric, the three percent decrease in the benefit of tPA with every passing quarter of an hour and the fact that the therapeutic window had closed before the hospital staff had mixed and begun administering the tPA suffices.

### b. Rushing

Rushing's causation opinion provides that if Alaniz "had received TPA in an appropriate and timely manner, based on reasonable medical probability, then more likely than not she would have recovered from the right middle cerebral artery stroke or at least shown major improvement."

Christus Spohn objects on speculative and conclusory grounds. According to Christus Spohn, "Dr. Rushing's suggestion that [Alaniz] 'would have recovered . . . or at least shown major improvement' is speculative. Dr. Rushing offers no medical facts specifically pertaining to Mrs. Alaniz to demonstrate how or why she would have recovered or to what extent she would have recovered." As for its conclusory objection, Christus Spohn contends:

Rushing's causation opinion is also conclusory because he fails to address foreseeability. Moreover, he fails to address cause-in-fact as he does not state that the hospital's alleged failure to timely prepare, mix and administer tPA was a substantial factor in bringing about Ms. Alaniz' injuries and but for this specific alleged failure Ms. Alaniz' injuries would not have occurred. He provides no explanation of how or why, factually or medically, the hospital's alleged failure to timely prepare, mix and administer tPA to Ms. Alaniz proximately caused her injuries or that she would have had a "good recovery".

Standing alone, Rushing's statements regarding recovery and major improvement may be classified as speculative and conclusory. However, section 74.351(i) allows a healthcare liability claimant to use multiple expert reports to satisfy any of the statutory requirements. *See Miller*, 536 S.W.3d at 514 (Tex. 2017) (citing TEX. CIV. PRAC. & REM. CODE ANN. § 74.351(i)). As noted in the preceding subsection, Futrell's elaboration that the delay in mixing and administering the tPA pushed Alaniz out of the therapeutic window, causing her to miss out on treatment with tPA is neither speculative nor conclusory.

### 4. Summary

Christus Spohn's second issue is overruled. Although we conclude that Rushing's report is deficient regarding all of the elements in section 74.351(r)(6), we also conclude that Futrell's report satisfies all of the statutory requirements. And, because the trial court may consider multiple reports, *see id.* § 74.351(i), it did not abuse its discretion in denying Christus Spohn's motion to the dismiss on the ground that Alaniz failed to file and serve expert reports that satisfy the elements in section 74.351(r)(6).

### III. CONCLUSION

We reverse the trial court's order and remand to the trial court to determine whether

21

to grant Alaniz a thirty-day extension to cure the deficiencies regarding Futrell's and Rushing's qualifications and Rushing's statements regarding the standard of care, breach, and causation. *See Leland v. Brandal*, 257 S.W.3d 204, 208 (Tex. 2008) (holding that an appellate court has discretion to remand a case for consideration of a thirty-day extension to cure the deficiency found by the appellate court).

LETICIA HINOJOSA
Justice

Delivered and filed the
2nd day of August,2018.